FILED
United States Court of Appeals
Tenth Circuit

September 15, 2015

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

SCOTT EIZEMBER,

      Petitioner - Appellant,

v.

ANITA TRAMMELL, Warden,
Oklahoma State Penitentiary,

      Respondent - Appellee.

No. 14-6012

---

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:08-CV-00377-C)**

---

Randall T. Coyne, University of Oklahoma College of Law, Norman, Oklahoma
(Edna Asper Elkouri and Frank Elkouri, Professor of Law, and Mark Henricksen
of Henricksen & Henricksen Lawyers, Inc., Oklahoma City, Oklahoma, with him
on the briefs), for Petitioner-Appellant.

Jennifer Dickson, Assistant Attorney General (E. Scott Pruitt, Attorney General of
Oklahoma, and Seth S. Branham, Assistant Attorney General, on the brief) of the
Oklahoma Office of the Attorney General, Oklahoma City, Oklahoma, for
Respondent-Appellee.

---

Before **BRISCOE**, Chief Judge, **GORSUCH** and **McHUGH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

Scott Eizember left a Tulsa jail intent on settling a score. He was upset with his ex-girlfriend, Kathy Biggs, because she had tipped off authorities about his violation of a protective order. So just as soon as he could he made for her hometown of Depew. Once there, he noticed an elderly couple leaving a house across the street from Ms. Biggs's home. Mr. Eizember decided the place would make an ideal lookout for Ms. Biggs and, after the couple left, he broke in. But A.J. and Patsy Cantrell didn't stay away as long as Mr. Eizember hoped, and when they returned home they found him pointing their own shotgun at them. A tense exchange followed but eventually things calmed down enough that Mr. Eizember set the gun down. It was then Mr. Cantrell saw his opportunity. He grabbed the gun and fired. The shot hit Mr. Eizember in the hand — but also tragically struck and killed Mrs. Cantrell. In what followed, Mr. Eizember wrestled the gun away from Mr. Cantrell and proceeded to beat him with it until he fell unconscious. Then Mr. Eizember dragged the Cantrells' bodies into the bathroom, where Mr. Cantrell was left to — and did — die.

The Cantrells' deaths proved only the beginning of things. Next, Mr. Eizember headed across the street, shotgun in hand, toward Ms. Biggs's house. Her son, Tyler Montgomery, saw him coming and tried to run, but before he could Mr. Eizember shot him in the back. Then Mr. Eizember turned on Mr. Montgomery's nearby grandmother, Carla Wright, and beat her with the shotgun too. Somehow in the midst of this melee Mr. Montgomery recovered enough to

2

run out of the house and into his pickup truck. Mr. Eizember followed right behind, jumping into the truck bed. Mr. Montgomery drove off erratically, hoping to shake Mr. Eizember, but he wouldn't be budged and even shot Mr. Montgomery again. Eventually Mr. Montgomery crashed into a pole, jumped out, and ran for help. Mr. Eizember headed in the other direction and managed to hitch a ride. When the driver grew suspicious, though, Mr. Eizember fired a shot at him too and leapt from the car.

For the next eleven days Mr. Eizember went to ground. Hiding in wooded areas around Depew — resurfacing only to steal clothes and a pistol from a nearby house — he succeeded in evading a police dragnet. But in time he realized he needed to make a break for it. So he stole a car he found outside a church, somehow eluded police lines, and made his way out of town. Soon, though, the car ran out of gas, leaving Mr. Eizember to continue his odyssey hitchhiking.

Continue it he did. Seeing Mr. Eizember on the roadside, Dr. Sam Peebles and his wife, Suzanne, stopped and offered him a lift. But as soon as he was settled in the car, Mr. Eizember turned his pistol on the couple and ordered them to drive him to Texas. The journey lasted hours. Finally, during a roadside break in Texas, Dr. Peebles drew his own revolver and shot Mr. Eizember. Mr. Eizember replied by wresting the revolver away and bludgeoning Dr. Peebles with the pistol he'd stolen back in Oklahoma. Then Mr. Eizember tried to shoot Mrs. Peebles. When the pistol wouldn't fire, he struck her in the head instead and ran

off. But it seems the wounds Dr. Peebles inflicted eventually caught up with Mr. Eizember. At a nearby convenience store the clerk heard he'd been shot and called the police. It was only then that the authorities at last arrested Mr. Eizember, taking him first to a hospital to recover, and, in time, to Oklahoma for trial.

A jury there found Mr. Eizember guilty of more than a few crimes: first-degree murder for Mr. Cantrell's death, second-degree felony murder for Mrs. Cantrell's death, assault and battery with a dangerous weapon for the attack on Mrs. Wright, shooting with intent to kill for the attack on Mr. Montgomery, and first-degree burglary for breaking into the Wrights' home. For the first-degree murder charge, the jury found two aggravating circumstances — that Mr. Eizember knowingly created a great risk of death to more than one person and that the murder was especially heinous, atrocious, or cruel — and sentenced him to death. For all the rest, the jury or judge settled on lesser sentences.

Mr. Eizember's various challenges to his convictions and sentences have so far proven unfruitful. The Oklahoma Court of Criminal Appeals rejected his direct appeal in *Eizember v. State*, 164 P.3d 208 (Okla. Crim. App. 2007), and the United States Supreme Court denied certiorari, *Eizember v. Oklahoma*, 552 U.S. 1269 (2008). The OCCA separately denied postconviction relief. *Eizember v. State*, No. PCD-2005-371 (Okla. Crim. App. Aug. 20, 2007). As did a federal district court. *Eizember v. Trammell*, No. 08-CV-00377-C, 2013 WL 6670275

4

(W.D. Okla. Dec. 18, 2013).  But in the district court Mr. Eizember did manage to obtain a certificate of appealability permitting him to raise a number of issues in this court and it is to them we now turn.

*

First and primarily, Mr. Eizember argues that the state trial court should have excluded two jurors — known in these proceedings by their initials, D.B. and J.S. — because they were impermissibly biased in favor of the death penalty. The trial court's failure to dismiss them, he says, renders his death sentence invalid.  But both the OCCA and the federal district court disagreed with this conclusion.  And because the OCCA addressed this claim of error on the merits (as it did all the claims Mr. Eizember now raises), the Antiterrorism and Effective Death Penalty Act of 1996 permits us to afford relief for putative legal errors only if we can say the state court's decision was either "contrary to" or "an unreasonable application of" clearly established federal law as determined by the Supreme Court.  28 U.S.C. § 2254(d)(1).  Mr. Eizember's habeas petition and his appeal to this court focus solely on the latter question, accepting that the OCCA "identifie[d] the correct governing legal rule" but disputing whether the court "unreasonably applie[d] [that rule] to the facts" of his case.  *Williams v. Taylor*, 529 U.S. 362, 407 (2000).

What is the Supreme Court's clearly established rule in this area?  In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Court held that "the proper standard

5

for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). So, by way of example, the Court has recognized that someone "who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances" (as the law requires) and thus necessarily fail the *Witt* standard. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). Still, the Court has cautioned, that's only an example: *Witt*'s substantial-impairment test isn't limited only to those jurors who would automatically vote one way or the other. *See Witt*, 469 U.S. at 424-26.

At the same time, the Court has stressed that the trial judge is best positioned to determine whether a potential juror will be able to follow his or her instructions — and that a court of appeals removed from the live proceedings must afford significant deference to the trial judge's assessments. In the Supreme Court's telling: "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it," including not only what they say but also their "nonverbal communication" — factors all of "critical importance in assessing the attitude and qualifications of potential jurors." *Uttecht v. Brown*, 551 U.S. 1, 9 (2007).

6

How do these established standards play out when we're called on to review not a federal trial court on direct appeal but the reasonableness of a state's application of federal law on collateral review? In *Brown* the Court explained that a federal court owes what we might fairly describe as double deference: one layer of deference because only the trial court is in a position to assess a prospective juror's demeanor, and an "additional" layer of deference because of AEDPA's "independent, high standard" for habeas review. *See id.* at 9-10. Indeed, the Court stressed that where, as here, the record reveals a "lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful *voir dire,* the trial court has broad discretion" on the issue of exclusion. *Id.* at 20.

With these standards in mind, we turn first to Mr. Eizember's challenge to juror D.B. Mr. Eizember argues that D.B.'s answers to a written questionnaire show she should have been excused. For this he relies primarily on the following six responses:

42. Have you ever formed an opinion either in favor or against the death penalty? If so, explain.

   Yes __X__ No _____

   *I firmly believe if you take a life you should lose yours.*

61. What are your feelings about the death penalty? Please explain:

   *I have no reservations about seeing someone put to death so long as it has been proven the person is guilty, especially if they have taken the lives of others.*

7

62. What purpose do you think the death penalty serves in our society?

   *Keeps taxpayers from having to support a criminal for the remainder of their life*

63. Do you think the death penalty in Oklahoma is used too often or too seldom?

   *Definitely not too often.*

64. Check the "one" statement which "best" summarizes your general views about capital punishment (the death Penalty):

   _____ 1. I am opposed to capital punishment under any circumstances.

   _____ 2. I am opposed to capital punishment except, in a few cases where it may be appropriate.

   _____ 3. I am neither generally opposed, nor generally in favor of capital punishment.

   _____ 4. I am in favor of capital punishment, except in a few cases where it may not be appropriate.

   _X_ 5. I am strongly in favor of capital punishment as an appropriate penalty.

73. If you were Mr. Eizember or the State of Oklahoma would you want yourself as a juror in this case?

   Yes (_____)      No (__X__)

   *Because if I feel guilt has been proven, I would not hesitate to impose the death penalty.*

8

These responses, Mr. Eizember argues, show that D.B. couldn't fairly consider all three sentencing options for first-degree murder (death, life without parole, and life with the possibility of parole) and had to be excluded.

Besides, even if these answers don't suffice to show that much, Mr. Eizember claims that D.B.'s colloquy with his lawyer during voir dire certainly does. During that exchange, counsel asked D.B. whether she would be able to consider a sentence of life without parole. "If the death penalty was not an option, yes," she replied. Asked to elaborate, she reasoned: "If they're in prison for the remainder of their life without a possibility of parole why not the death penalty?" The exchange continued:

[Q]: All right, so are you, are you telling me then that if you had a situation where it was laid out on the table, life, life without parole or death, then you would automatically consider one of those?

[A]: Automatically consider one of —

[Q]: One of those punishments over the others?

[A]: Probably.

[Q]: And —

[A]: Yes.

[Q]: And that would be death?

[A]: Yes.

9

After counsel clarified the posture under which D.B. might have to make such a decision — only if and after the jury found the defendant guilty of intentional murder — he again asked whether she "would automatically say it should be the death penalty." D.B. responded that she "would have to look at all three but just off the cuff, it would probably be death," explaining too that she "would have to try hard" to endorse life without parole.

While acknowledging that Mr. Eizember's concerns about D.B. are hardly trivial, the OCCA held that the trial court didn't commit reversible error when it decided to retain her as a juror. As a threshold matter, the OCCA explained, the questionnaire must be understood in context: it asked potential jurors to share their views on capital punishment before voir dire began and before the court could explain the potentially available punishments, the factors that must be considered when choosing one, and the need to find and weigh aggravating and mitigating circumstances before imposing a death sentence. *Eizember*, 164 P.3d at 220-21. So, the OCCA held, the questionnaire cannot be "considered in isolation." *Id.* at 221. Instead, the court reasoned, it must be viewed in conjunction with the potential juror's responses to live questions at voir dire after the court instructed the prospective panel members about the law's demands. And broadening its view to take in "the totality of [D.B.'s] *voir dire*, written and oral responses," the OCCA saw adequate support for "the trial court's finding that Juror D.B. did not have such a strong bias towards the death penalty that the

10

performance of her duties as juror would be prevented or substantially impaired."
*Id.* at 226.

Beginning with the questionnaire, the OCCA noted that Mr. Eizember focused on certain questions and answers but neglected others. For example, Mr. Eizember overlooked responses that "indicate[d] Juror D.B. could be a fair and impartial juror." *Id.* at 225. Like this one:



65. Assume you are on a jury to determine the sentence of a defendant who has already been convicted of a very serious crime. If the law gives you a choice of death or life imprisonment, or some other penalty: (check only one)

    _____ 1. I could not vote for the death penalty regardless of the facts and circumstances of the case.

    _____ 2. There are some kinds of cases in which I know I could not vote for the death penalty even if the law allowed me to, but others in which I would be willing to consider voting for it.

    __X__ 3. I would consider all of the penalties provided by law and the facts and circumstances of the particular case.

    _____ 4. I would usually vote for the death penalty in a case where the law allows me to.

    _____ 5. I would always vote for the death penalty in a case where the law allows me to.

The court noted that Mr. Eizember similarly overlooked responses from voir dire — again, after D.B. had been instructed on the law — suggesting that she could and would consider all three sentencing options and all mitigating and

11

aggravating circumstances. The transcript shows D.B. confirming —
repeatedly — that she could "consider all three punishments," Voir Dire Tr. 207-08, 233; that she would follow the court's instructions and would not enter deliberations with a preconceived outcome, *id.* at 236-37; that she "could put aside any personal beliefs or predispositions," *Eizember*, 164 P.3d at 224; and that she "did not have any moral, ethical or religious obligations that would keep her from" following the court's directions, *id.*

Beyond this, the OCCA held, the voir dire responses on which Mr. Eizember most relied weren't as damning as he suggested. For example, the court reasoned that D.B.'s "response that 'off the cuff' she would consider death as punishment for intentional murder" merely "illustrate[d] a 'gut reaction.'" *Id.* at 225. The court said it was "confident that any determination made during jury deliberations would be an informed decision and not merely 'off the cuff.'" *Id.* And, recalling that the trial court had "the benefit of observing D.B.'s demeanor throughout *voir dire*," the OCCA concluded that "the trial court did not abuse its discretion in refusing to remove her for cause." *Id.* at 226.[1]

---

[1] The OCCA noted that it reviewed Mr. Eizember's objection to juror D.B. only under the plain error standard because, to preserve a complaint about a trial court's failure to dismiss a juror for cause, a litigant in Oklahoma state court must apparently exercise a peremptory challenge. *See Eizember*, 164 P.3d at 223. This naturally raises the question whether the state court's use of the plain error standard affects the degree of deference we owe its decision — or whether it might provide an adequate and independent state law ground that precludes our review. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). At least under this court's precedents, however, if a state court on plain error review denies relief on

12

We cannot say, as Mr. Eizember asks us to, that this decision represents an unreasonable application of the Supreme Court's clearly established federal law precedents, especially in light of the double deference we owe. Some of D.B.'s questionnaire responses do seem to suggest a bias in favor of the death penalty. But the questionnaire contains other responses that undercut that conclusion and suggest a willingness to consider all the aggravating and mitigating facts and all the available penalties. As the OCCA emphasized, too, D.B.'s questionnaire responses came before she received instructions about the law's demands and addressed her ability to follow them at voir dire. During the three days of voir dire proceedings that followed — spanning 507 pages of transcript — the trial court had the opportunity to view D.B. firsthand and assess her demeanor, the tone of her oral responses, and her reactions to the law as instructed. And here many more of D.B.'s statements suggest a willingness to follow the court's directions and keep an open mind. To be sure, even at this stage her statements remain something of a mixed bag. It may even be that the trial court could have lawfully chosen to dismiss D.B. Or that the OCCA could have lawfully chosen to reverse the trial court's decision to retain D.B. But none of that necessarily means the OCCA unreasonably upheld the trial court's firsthand finding that D.B. was a qualified juror. Before us are an inconclusive factual record and a highly

a federal claim by deciding there was no federal law error at all — the course the OCCA chose in this case — our standard AEDPA standards apply. *See Douglas v. Workman*, 560 F.3d 1156, 1177-78 (10th Cir. 2009) (per curiam).

13

deferential legal standard:  a combination that precludes us from forming the conviction necessary to deem the OCCA's decision an unreasonable application of federal law.  When it comes to juror exclusion, the unavoidable fact is that the Supreme Court has left considerable room for trial court discretion, a discretion AEDPA only magnifies in the context of federal court review of state court decisions, and the resulting spectrum of permissible or reasonable judgment is large indeed.

We find confirmation of our judgment on this score in the fact that other federal courts have applied relevant Supreme Court precedent much as the OCCA did in this case, upholding trial court decisions to retain jurors in the face of mixed responses very much like D.B.'s — and even in the face of responses arguably more doubtful.  *See, e.g.*, *United States v. Fulks*, 454 F.3d 410, 428 (4th Cir. 2006) (holding that a juror's statement that he would vote for the death penalty "90 percent of the time" did not "require his exclusion"); *Bowling v. Parker*, 344 F.3d 487, 519-21 (6th Cir. 2003) (finding no constitutional error where the trial court seated a juror who "initially state[d] that he would automatically give the death penalty to those who met the aggravating factor" but "later . . . expressly said that he would consider mitigating evidence," *id.* at 520).  To say the OCCA unreasonably applied federal law in this case we would likely have to say these courts did the same in their cases.  The alternative conclusion — that the Court's precedents leave considerable room for discretion and that all

14

these courts have at least *reasonably* applied its precedents — strikes us as far more likely.

Turning to Mr. Eizember's complaint about juror J.S., we confront a much easier case. In attempting to show J.S. was impermissibly biased in favor of the death penalty, Mr. Eizember again points to several questionnaire responses:

61. What are your feelings about the death penalty? Please explain:

    *Pro-Death*
    *Depending on the crime committed*

62. What purpose do you think the death penalty serves in our society?

    *Takes repeat offenders out of civilized society.*

63. Do you think the death penalty in Oklahoma is used too often or too seldom?

    *About right*

64. Check the "one" statement which "best" summarizes your general views about capital punishment (the death Penalty):

    _____ 1. I am opposed to capital punishment under any circumstances.

    _____ 2. I am opposed to capital punishment except, in a few cases where it may be appropriate.

    _____ 3. I am neither generally opposed, nor generally in favor of capital punishment.

    __✓__ 4. I am in favor of capital punishment, except in a few cases where it may not be appropriate.

15

_____ 5.      I am strongly in favor of capital punishment as an appropriate penalty.

73.      If you were Mr. Eizember or the State of Oklahoma would you want yourself as a juror in this case?

Yes (_____)      No (___✓___)

*If guilty, he will be on death row and eventually executed.*

But like D.B., J.S. checked the option next to "I would consider all of the penalties provided by law and the facts and circumstances of the particular case" when asked about his ability to vote for the death penalty. And like D.B., once advised at voir dire of the three possible punishments for a first-degree murder conviction and the law concerning their application, J.S. replied that he could consider all three and would follow the court's instructions. Neither, unlike D.B., did J.S. offer any comments during voir dire that might seem to cut in the other direction. The OCCA concluded that J.S.'s responses "showed he did not hold views regarding punishment that would prevent or substantially impair the performance of his duty as a juror in accordance with his instructions and oath as a juror." *Eizember*, 164 P.3d at 223. And having concluded that the OCCA's resolution of the *Witt* question wasn't unreasonably wrong when it comes to D.B., we must necessarily do the same on this lesser record when it comes to J.S.[2]

_____

[2]   Lingering around the edges of Mr. Eizember's argument here is the implication that J.S.'s willingness to reschedule his rotator cuff surgery to serve on the jury should raise a red flag. But the OCCA held that J.S.'s response "merely indicated a willingness to do his civic duty." *Eizember*, 164 P.3d at 223. And Mr. Eizember doesn't develop any argument or point to any part of the

16

\*

Our dissenting colleague suggests that we don't need to reach the question whether the OCCA reasonably applied *Witt* to the facts of this case because that court didn't apply *Witt* at all — at least when it came to juror D.B. Instead of asking whether D.B.'s views "prevent[ed] or substantially impair[ed]" the performance of her duties as *Witt* requires, the dissent suggests that the OCCA asked an entirely different question: whether D.B. would automatically vote for the death penalty because she was "irrevocably committed" to that outcome. In this way, the dissent reasons, the OCCA relied on an incorrect legal standard and so its decision was "contrary to" clearly established federal law. For our part, we are unable to subscribe to this line of argument for various reasons.

First is the fact Mr. Eizember never made it. AEDPA says that we may undo a state court decision either if it employed a rule of law "contrary to" what the Supreme Court has prescribed or if it "unreasonably applie[d]" the correct legal rule to the particular facts before it. *Williams*, 529 U.S. at 412-13 (quoting 28 U.S.C. § 2254(d)(1)). The Supreme Court has long recognized that a state court's identification of the correct governing legal standard and the reasonableness of its application of that standard to the facts are two distinct statutory inquiries. *See id*. Indeed, petitioners frequently will accept that the state court identified the correct rule of law and challenge only the reasonableness of its application of that rule to

record that would allow us to declare that conclusion unreasonable.

17

the particulars of the case at hand, thus bypassing the first AEDPA inquiry and inviting the reviewing court to proceed directly to the second. *See, e.g.*, *Parker v. Scott*, 394 F.3d 1302, 1308 (10th Cir. 2005) (proceeding to the question of reasonable application where there was no argument that the court's decision was "contrary to" clearly established law); *Etherly v. Davis*, 619 F.3d 654, 661 (7th Cir. 2010) (same); *Collado v. Miller*, 157 F. Supp. 2d 227, 231 (E.D.N.Y. 2001) (same). That is exactly what happened in this case. In six and a half years of proceedings in federal court Mr. Eizember never argued, as the dissent now does, that the OCCA employed a legal standard "contrary to" *Witt*. Instead and accepting that the OCCA correctly identified *Witt* as the governing standard, Mr. Eizember has argued only that the OCCA's application of that standard — the answer it gave to the question *Witt* poses — was unreasonable given the facts in this particular case. Because there's nothing in Mr. Eizember's district court petition resembling the argument the dissent now seeks to advance on his behalf, he forfeited such a contention there. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011). And because there's nothing in his opening brief in this court raising the argument either, it is independently waived here. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998).

To be sure, the dissent faults the district court for failing to address the question whether the OCCA applied a rule of law contrary to *Witt*. The dissent also faults the State for failing to address the question on appeal. The dissent

18

even faults the State's appellate brief for failing to observe any potential forfeiture and waiver problems attending the argument. But it seems to us that the fact no one has ever addressed the argument the dissent wishes to press should be a clue. A clue that this just isn't a case where the district court missed an issue presented to it or where the petitioner expressly sought to introduce a new issue on appeal and the State might have been expected to offer a response in its appellate briefing. A clue that this is a case instead where an appellate dissent seeks to devise a new ground for reversal for the petitioner that the petitioner has never pursued for himself in a great many filings over a great many years of litigation.

Indeed, the dissent's considerable efforts to prove that Mr. Eizember presented and preserved its argument before the district court and this one do more to confirm the opposite conclusion in our view. The dissent's citations to Mr. Eizember's pleadings in district court show him reciting the § 2254(d)(1) standard and then proceeding to make the same argument he does here, the same argument we've addressed above, the argument that the OCCA unreasonably applied *Witt* to the facts in this record surrounding jurors D.B. and J.S. *See* Dissent at 23-24. Precisely none of the dissent's citations shows him arguing that the OCCA employed a legal standard contrary to *Witt* and we simply cannot fault the district court for failing to see what wasn't there. When it comes to Mr. Eizember's appeal, the dissent plucks (and repeats) two sentences from his 80

19

page opening brief in which Mr. Eizember first notes the OCCA's observation that D.B. wasn't "irrevocably committed to any one punishment" and then proceeds to comment flatly that this "is not the correct standard." *See* Dissent at 24 (quoting Appellant's Br. at 28). But these two sentences, the very best the dissent can do to show preservation in all of Mr. Eizember's pleadings before this court or the district court, say no more on the question whether the OCCA identified the correct *Witt* standard. In fact, they stand surrounded by argument and in a section of the brief expressly challenging the reasonableness of the OCCA's application of *Witt* to the facts of this case, not its identification of that case or its governing legal standard. And this court has repeatedly instructed that stray sentences like these are insufficient to present an argument (let alone one forfeited below) in a way that might fairly inform opposing counsel or a court of its presence in the case. *See Grant v. Trammell*, 727 F.3d 1006, 1025 (10th Cir. 2013) ("Even a capital defendant can waive an argument by inadequately briefing an issue . . . ."); *Fairchild v. Trammell*, 784 F.3d 702, 724 (10th Cir. 2015) (same).[3]

---

[3] Faced with this problem, the dissent adds a further reply at the tail end of its opinion. Here it claims it isn't inventing for Mr. Eizember an argument that the OCCA applied a legal standard "contrary to" federal law but only arguing that the OCCA "unreasonably applied" the correct federal legal standard to the facts of the case. *See* Dissent at 25. This new reply, however, emerging at the end of the dissent, is pretty hard to square with all the argument that comes before it. *See id.* at 14 (contending that "the OCCA applied an incorrect legal standard"); *id.* (alleging that the OCCA "applied a legal standard that is inconsistent with

20

Second, it turns out that there's a very good reason why the capable lawyers in this case never made the dissent's argument: it lacks merit.[4] The Supreme Court has repeatedly reminded us that "AEDPA's requirements reflect a 'presumption that state courts know and follow the law.'" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). This presumption demands that federal judges "afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Reading the OCCA's opinion, it quickly becomes clear this is not such an extreme case. The OCCA

clearly established federal law"); *id.* at 17 (asserting "the OCCA's 'irrevocably committed' standard is not the same as, and indeed is less demanding than, the controlling standard outlined in *Witt*"); *id.* at 22 (arguing that the state court "was applying the OCCA's own 'irrevocably committed' standard, rather than the *Witt/Adams* standard"). By any reasonable reckoning the dissent contends that the OCCA committed error by using a legal standard contrary to federal law when assessing juror D.B. And by any reasonable reckoning nothing like that argument appears *anywhere* in Mr. Eizember's materials. Unable to shake this reality, the dissent retreats further and at the very close seems finally to suggest that, even if Mr. Eizember has never made its argument, we should. *See id.* at 26-27. But as we've seen, the Supreme Court has recognized that the "contrary to" and "unreasonable application" questions are distinct statutory questions and courts routinely move to the second question when the first isn't in dispute. *See supra* at 17-18. Neither does the dissent offer any argument or authority suggesting that this court may or should *sua sponte* on appeal develop an argument for reversal on the first question that a habeas petitioner has not ever himself pursued. Nor could it for, as we've seen, governing law is to the contrary, holding that even a capital defendant may forfeit or waive arguments by declining to pursue them anywhere in a litigation as long lived as this one. *See Grant*, 727 F.3d at 1025; *Fairchild*, 784 F.3d at 724.

[4] The discussion of this second concern attending the dissent's line of argument represents the opinion of Judge Gorsuch only.

21

cited *Witt* no fewer than five times. It began its discussion of the juror bias question by quoting *Witt*'s substantial impairment test and recognizing it as the "proper standard." *Eizember*, 164 P.3d at 221. And in concluding its analysis of D.B.'s responses, the court expressly held that she "did not have such a strong bias towards the death penalty that the performance of her duties as juror would be prevented or substantially impaired" — language that tracks *Witt* almost verbatim. *Id.* at 226; *see Witt*, 469 U.S. at 424.

The dissent acknowledges all this. Neither does the dissent dispute that the OCCA both correctly identified and reasonably applied *Witt*'s standard when it came to juror J.S. Still, the dissent suggests, the OCCA somehow missed the very same governing legal standard when addressing juror D.B. By way of support and again, the dissent points to a sentence in which the OCCA offered its view that D.B. was not "irrevocably committed" to the death penalty. This sentence, the dissent argues, proves the OCCA applied an erroneous legal standard. But the Supreme Court itself has acknowledged that showing a juror's irrevocable or automatic commitment is one quite legitimate, if surely not exclusive, way to satisfy the *Witt* standard for impermissible bias. *See supra* at 7. Neither did the OCCA stop there, for it continued on and explained its additional view that D.B. would not be "substantially impaired" in her ability to consider all the penalties the law provides — thus squarely addressing the alternative method of satisfying the *Witt* standard. *See Eizember*, 164 P.3d at 226. In light of all the evidence that

22

the OCCA applied *Witt* when it came to D.B., just as it did when it came to J.S., and in light of the respect AEDPA requires us to afford our state counterparts, it would be quite wrong to give talismanic weight to the OCCA's passing — and entirely pertinent — observation on the way to its essential conclusion. Under AEDPA we must assume a state court is applying the correct federal legal standard even when it mentions no legal standard at all. *See Witt*, 469 U.S. at 431; *Harrington v. Richter*, 562 U.S. 86 (2011). Surely we must as well assume the state court is applying the correct federal legal standard when it *tells us* it is — and when viewed fairly it appears to be — doing just that. Any other course would evince a serious disrespect for state courts, run afoul of the federalism and comity concerns that undergird AEDPA, and risk inviting reversal for misapplication of that statutory scheme. *See, e.g.*, *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam) (summarily reversing a grant of habeas relief because the state court had relied on a ground that was "sufficient" under federal law, even though it had also relied on an independent "ground of questionable validity").

Third, even if we were to adopt Mr. Eizember's argument it would only mean AEDPA deference no longer applies and we must engage in a *Witt* analysis ourselves. *See Trammell v. McKune*, 485 F.3d 546, 550 (10th Cir. 2007). And even without the additional layer of AEDPA deference, *Brown* would still require us to afford significant deference to the trial court's decisions on the question of

23

juror bias.  551 U.S. at 9.  Given that — and given the ambiguous record concerning  D.B.'s views — we would still find ourselves without a lawful basis to overturn the trial court's first-hand assessment that she could fairly discharge her duties as juror.  Indeed and again (though not acknowledged by the dissent), other circuits have upheld trial court decisions to retain potential jurors on records that are, if anything, a good deal more favorable to the defendant than the one before us.  *See supra* at 14 (discussing *Fulks*, 454 F.3d at 428; *Bowling*, 344 F.3d at 519-21).[5]

*

Moving from arguments about jury selection to arguments about jury instructions, we face a due process question.  Everyone agrees that Oklahoma law provides three possible sentences for first-degree murder:  death, imprisonment for life without parole, or imprisonment for life with the possibility of parole.

---

[5]   After denying deference to the state appellate court under AEDPA, the dissent seems to suggest it owes no deference to the state trial court under *Brown* because it too applied the wrong legal standard.  But as proof the dissent cites only questions the court asked potential jurors — not the legal standard the court used when assessing their responses.  And where, as here, "the record does not indicate the standard applied by a state trial judge, he is presumed to have applied the correct one." *Witt*, 469 U.S. at 431.  Besides, many of the trial judge's questions suggest a full understanding of *Witt* (for example, asking jurors whether they could "consider" or "fairly consider" all three legally available punishments).  And in any event and again, the dissent here presses an argument for Mr. Eizember that he's never pressed for himself.  Here we don't even have two stray sentences from Mr. Eizember:  his briefing before the district court and this court nowhere suggests that the *trial court* misidentified the governing law. Any claim along these lines would therefore appear long forgone.

24

Okla. Stat. Ann. tit. 21, § 701.9(A). But Mr. Eizember argues that the jury was confused about the meaning of the third option — what the State calls a "straight" life sentence. He contends that, thanks to a prospective juror's erroneous comment during voir dire, the jury pool was left with the misimpression that a "straight" life sentence could give way to parole in seven or twenty years. In fact, he tells us, Oklahoma law requires someone sentenced to "straight" life to serve at least thirty-eight years in prison before becoming parole eligible. Mr. Eizember says the trial court never adequately cleared up this confusion among members of the jury and the result was a violation of a federal due process guarantee articulated in *Simmons v. South Carolina*, 512 U.S. 154 (1994). To remedy this violation, he claims, we must at least vacate his capital sentence.[6]

*Simmons* held that "[w]here the State puts the defendant's future dangerousness in issue, and the only available alternative sentence to death is life imprisonment without possibility of parole, due process entitles the defendant to inform the capital sentencing jury — by either argument or instruction — that he is parole ineligible." 512 U.S. at 178 (O'Connor, J., concurring in the judgment); *id.* at 168-69 (plurality opinion) (same). Simply put, *Simmons* prevents a state

---

[6]    At times Mr. Eizember's brief suggests that the jury's confusion violated not only his due process rights but also his rights under the Sixth and Eighth Amendments. But when it comes to citing a Supreme Court case that articulates the "clearly established" law he would have us apply Mr. Eizember offers just *Simmons*, a case that situates the right in question in the Due Process Clause of the Fourteenth Amendment.

from giving the jury at the sentencing phase in a capital case "a false choice between sentencing [the defendant] to death and sentencing him to a limited period of incarceration." *Id.* at 161 (plurality opinion).

We don't see how the OCCA clearly misconstrued or unreasonably misapplied *Simmons*. After all, no one questions that the jury was correctly instructed that life without parole was an option in this case. And no one questions that the jury was correctly instructed that life without parole means precisely that. So even assuming the jury was confused about the consequences of a "straight" life sentence, it just "was not faced" with the "false choice" the Court faced and condemned in *Simmons*. *Eizember*, 2013 WL 6670275, at *15 (mem. op. at 28). Indeed, it seems to us that Mr. Eizember can't and doesn't complain so much that the OCCA *misapplied Simmons* as that the OCCA should have *extended* its reasoning to the situation presented here. In his view, the Constitution should be read to ensure not only that a capital jury is properly instructed about the availability and meaning of life without parole. Instead, he says, the Constitution should *also* be read to guarantee that a capital jury is properly instructed about the details of a "straight" life sentence where parole is a possibility. The problem is that, under AEDPA, this court is authorized to intervene only when state courts fail to apply the Supreme Court's existing and clearly established teachings reasonably, not when they fail to extend them in new and novel ways. *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (emphasizing

26

that AEDPA "does not require state courts to *extend* [Supreme Court] precedent or license federal courts to treat the failure to do so as error").

*

Mr. Eizember next attempts an even more ambitious version of his *Simmons* argument. So far he's suggested only that his capital sentence should be vacated because the trial court didn't instruct the jury that a "straight" life sentence guaranteed him at least thirty-eight years in prison. Now he argues that this same failure requires us to vacate his first-degree murder conviction and perhaps his noncapital convictions and sentences too. But where is the clearly established federal law compelling such a conclusion? We can't find it in *Simmons*, a case that (again) addressed only what a jury must be told when deciding a sentence for a capital crime — and a decision that does not clearly apply to the guilt phase or to non-capital sentencing proceedings. Neither can we find it in *Shafer v. South Carolina*, 532 U.S. 36 (2001), another case Mr. Eizember cites, because *Shafer* expressly confirms our understanding of *Simmons*'s reach. *See id.* at 51 ("It is only when the jury endeavors the moral judgment whether to impose the death penalty . . . that *Simmons* comes into play . . . .").

Besides these two cases most of Mr. Eizember's argument in this direction is predicated on state — not federal — jurisprudence. He contends that Oklahoma law entitled him to a correct instruction about the parole consequences of a "straight" life sentence. And he faults the OCCA for failing to apply

27

Oklahoma law correctly in this respect.  But even assuming without granting that Mr. Eizember is right about all this it does little to help him — for, again, this court's role on collateral review isn't to second-guess state courts about the application of their own laws but to vindicate federal rights.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

True, in the course of his extended state law discussion Mr. Eizember does cite in passing two more federal cases still.  The first is *Hicks v. Oklahoma*, 447 U.S. 343 (1980), where the Supreme Court held that the federal due process guarantee sometimes requires states to abide their own procedural rules, at least when those rules create a "substantial and legitimate" liberty interest.  *Id.* at 346. The second is *Lisenba v. California*, 314 U.S. 219 (1941), which recognized that every trial must observe principles of "fundamental fairness" to satisfy due process.  *Id.* at 236.  But, as the State correctly notes, Mr. Eizember didn't advance any federal law argument under *Hicks* or *Lisenba* before the district court and he has, accordingly, forfeited any argument based upon them in this court. *See Wilburn v. Mid-South Health Dev., Inc.*, 343 F.3d 1274, 1280-81 (10th Cir. 2003).  Neither for that matter does Mr. Eizember even fairly develop a *Hicks* or *Lisenba* argument in this court.  Yes, he cites the decisions in passing during an extended state law discussion, but he never attempts to explain either how a state law instructional rule about parole consequences creates a substantial liberty interest under federal law or how such a rule might be required to render any

28

criminal trial fundamentally fair.  Or how Supreme Court precedent might clearly compel such conclusions in a way that would satisfy AEDPA.  And it's settled law that insufficient briefing of this sort will serve to waive an issue in this court even if it was fairly presented and preserved in the district court.  *See Grant*, 727 F.3d at 1025.

*

Mr. Eizember next challenges the trial court's jury instructions on the charges related to Mr. Cantrell's death.  The state trial court instructed the jury on first-degree "malice aforethought" murder and two separate lesser-included offenses:  second-degree "depraved mind" murder and second-degree felony murder.  *See* Okla. Stat. Ann. tit. 21, §§ 701.7(A),  701.8.  But by everyone's admission the court misstated Oklahoma law in reciting the elements of "depraved mind" murder, erroneously informing the jury that it couldn't convict Mr. Eizember of that offense if he intended to kill *or harm* his victim.  While intent to kill does preclude a conviction for "depraved mind" murder under state law — compelling instead a first-degree murder conviction — mere intent to harm does not.  *See Eizember*, 164 P.3d at 235.  Here Mr. Eizember has, as well, sought to link this state law error to the violation of federal right, contending that the error amounted to a violation of his federal due process rights under *Beck v. Alabama*, 447 U.S. 625 (1980).

29

How so?  In *Beck*, the Supreme Court held that "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense — but leaves some doubt with respect to an element that would justify conviction of a capital offense — the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction."  447 U.S. at 637.  This risk, the Court held, is intolerable in capital cases, so a state is "constitutionally prohibited from withdrawing that option from the jury." *See id.* at 637-38.  And, according to Mr. Eizember, this exact risk manifested itself in his trial:  the trial court's error in instructing the jury on "depraved mind" murder pushed the jury toward an unwarranted first-degree murder conviction for Mr. Cantrell's death.  Of course, by his own admission the jury still had before it another lesser-included offense — felony murder — on which the trial court issued unchallenged instructions.  But, Mr. Eizember argues, we should hold this insufficient to satisfy *Beck*.  In his view, that case should be read as requiring not only that the jury receive *some* noncapital option but the *best* noncapital option, the one most fitting to the defendant's theory of the case — and here, he argues, that meant "depraved mind" murder.

Mr. Eizember's *Beck* argument, however, confronts a challenge in *Schad v. Arizona*, 501 U.S. 624 (1991).  There the jury was instructed on "robbery murder" (a capital offense) and second-degree murder (a noncapital offense).  The

30

defendant argued that he was also entitled to a plain-old robbery instruction as well. But the Court disagreed, even though the trial court's failure to instruct on robbery meant the jury couldn't return a verdict that was consistent with the defendant's preferred theory of the case. *Id.* at 647. The Court explained that *Beck* doesn't guarantee multiple lesser-included offense instructions or the defendant's favorite such instruction. Instead, it simply precludes an "all-or nothing choice between the offense of conviction (capital murder) and innocence." *Id.*

It seems to us Mr. Eizember finds himself in much the same position as the defendant in *Schad*. Here, as there, the jury did not face an all-or-nothing choice but was instead presented with the required "third option." After all, even without a proper second-degree "depraved mind" murder instruction, the jury in this case still had at hand a viable, noncapital, lesser-included alternative if it was unconvinced that Mr. Cantrell's killing rose to the level of first-degree murder: it could have convicted him of felony murder. So because "the court instruct[ed] the jury on one lesser included offense supported by the evidence," *Beck* was not clearly implicated for AEDPA purposes "even if instructions on other lesser included offenses might have been warranted." *Bland v. Sirmons*, 459 F.3d 999, 1016 (10th Cir. 2006).

Retreating now, Mr. Eizember argues that the evidence in this case was legally insufficient to support a felony murder conviction for the death of Mr.

31

Cantrell.  In this way, he says, felony murder just wasn't a legally viable option for the jury and a *Beck* problem persists even after *Schad* is taken into account. But it's hard to see how the OCCA's determination otherwise was unreasonable. Mr. Eizember himself requested the felony murder instruction — and usually, of course, a party cannot later claim that a jury instruction given at his request was given in error.  *See Parker v. Champion*, 148 F.3d 1219, 1221-22 (10th Cir. 1998).  Besides, there's plenty of reason to think the evidence at trial could have supported a felony murder conviction for Mr. Cantrell's death.  After all, Mr. Eizember himself argued at trial that he didn't intend to kill either of the Cantrells.  The jury apparently accepted this very argument when it came to *Mrs.* Cantrell, for it convicted Mr. Eizember of felony murder for her death.  It's undisputed, too, that the homicidal acts resulting in both victims' deaths were separated by a few seconds and a few feet.  So there's every reason to suppose that if the jury believed Mr. Eizember's claim he didn't intend to kill Mr. Cantrell when he hit him with the gun, it also "could have found Mr. Cantrell's murder occurred during the course of a burglary" — and thus constituted felony murder — just as it "found with Mrs. Cantrell's murder." *Eizember*, 164 P.3d at 235; *see also Wade v. State*, 581 P.2d 914, 916 (Okla. Crim. App. 1978) (noting that under the felony murder doctrine in Oklahoma "the accused can be found guilty of murder even though the killing is unintentional").  To be sure, the evidence didn't compel a conclusion that Mr. Cantrell's death was unintentional

and better described as felony murder than first-degree murder, but neither did it foreclose that conclusion and to know that much is to know no clear *Beck* error transpired here. *See Eizember*, 164 P.3d at 235-36; *Eizember*, 2013 WL 6670275, at \*19-20 (mem. op. at 37-40).[7]

*

Finally, even if failing to give a proper instruction on second-degree "depraved mind" murder wasn't itself a constitutional violation under *Beck*, Mr. Eizember submits his attorney's failure to object to the instruction on state law grounds amounted to constitutionally ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). This argument, however, requires no extended discussion to resolve. Everyone acknowledges that, to prevail under *Strickland*, a defendant must show his lawyer's putative error prejudiced him. Yet, as the OCCA observed, even supposing Mr. Eizember's attorney *had* secured a proper instruction on (unintentional) "depraved mind" murder, the jury would have been legally obliged to reject it anyway. That's because a "depraved mind" murder conviction in Oklahoma is unavailable as a matter of state law when the jury finds a killing intentional beyond a reasonable doubt — precisely what the jury did here when it convicted Mr. Eizember of first-degree murder. *See*

---

7 In his reply brief Mr. Eizember contends for the first time that the evidence at trial was legally insufficient to permit the jury to find him guilty of second-degree burglary, the predicate felony for a felony murder conviction in this case. This argument appears too late in these proceedings and is therefore waived. *See Bronson v. Swensen*, 500 F.3d 1099, 1104-05 (10th Cir. 2007).

*Eizember*, 164 P.3d at 235; *see also* Okla. Stat. Ann. tit. 21, § 701.8(1).  In this way, the OCCA observed, trial counsel's failure to object to the "depraved mind" murder instruction ultimately had no impact on Mr. Eizember's substantial rights. Neither has Mr. Eizember identified any flaw in this reasoning or any Supreme Court authority suggesting that this assessment is a clearly impermissible or unreasonable application of *Strickland*'s prejudice test and we are aware of none.[8]

The judgment of the district court is affirmed.

---

[8]  Mr. Eizember argues we should reverse as well in light of "cumulative error" — suggesting that we aggregate all errors in his case found to be harmless and analyze their effect when considered together.  But the circuits are split on "whether the need to conduct a cumulative-error analysis is clearly established federal law" for AEDPA purposes — and this court's position on the question is murky at best.  *Hooks v. Workman*, 689 F.3d 1148, 1194 n.24 (10th Cir. 2012).  Fortunately we again find we don't need to answer the question directly:  even if Mr. Eizember could overcome this problem, we have identified here no harmless federal law errors to accumulate.

**No. 14-6012, Eizember v. Trammell**

**BRISCOE**, Chief Judge, concurring in part and dissenting in part.

I would affirm Eizember's convictions, but reverse his death sentence and remand for resentencing before a fair and impartial jury. I agree with the majority that Eizember has failed to establish his entitlement to federal habeas relief from his state court convictions. But, contrary to the majority, I find merit to Eizember's claim "that he was denied an impartial jury and due process of law due to the [state] trial court's denial of [a] for-cause challenge[] against . . . juror[] . . . D.B.," who "served and voted to condemn . . Eizember to death." Aplt. Br. at 10. Eizember raised this issue on direct appeal and the Oklahoma Court of Criminal Appeals (OCCA) rejected it. As discussed below, I conclude that the OCCA's "adjudication of th[is] claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). I in turn conclude, applying a de novo standard of review, that the state trial court likewise failed to apply the proper legal standard in assessing whether juror D.B. could impartially consider the sentencing options available in a death penalty case. Juror D.B. should have been stricken for cause. As a result, I conclude that Eizember has established his right to federal habeas relief on this claim in the form of a new sentencing proceeding.[9]

---

[9] In light of this conclusion, I do not reach the other sentencing-related claims asserted by Eizember, including his claim that juror J.S. should have been

(continued...)

*I. Facts relevant to the claim*

The OCCA, in resolving Eizember's direct appeal, outlined the basic facts

relevant to this claim:

> Jury selection in this case was begun by dividing the prospective
> jurors into three groups and giving each individual a twelve page
> juror questionnaire to fill out. The written questionnaires were
> completed prior to the commencement of oral *voir dire*. Each of the
> three groups was then selected for a morning or afternoon session
> devoted to life and death qualification. After all potential jurors had
> been so qualified, general *voir dire* was conducted until thirty
> persons had been passed for cause. Then, recalling prospective
> jurors in the original order, the first twelve were seated in the jury
> box. Peremptory challenges were limited to those jurors in the box.
> As peremptory challenges were made, replacements were drawn from
> the pool of pre-qualified jurors.

Eizember v. State, 164 P.3d 208, 220 (Okla. Crim. App. 2007) (paragraph number

and footnote omitted).

> [D.B's] juror questionnaire contain[ed] six (6) questions relating to
> the death penalty. Question No. 42 asked if the prospective juror had
> ever formed an opinion either in favor or against the death penalty
> and if so to explain. D.B. wrote, "I firmly believe if you take a life
> you should lose yours." In Question No. 61, prospective jurors were
> asked to explain their feelings about the death penalty. Juror D.B.
> wrote, "I have no reservations about seeing someone put to death so

---

[9](...continued)
stricken for cause. After concluding that D.B. was not properly adjudged a fair
and impartial juror and, therefore, should not have sat on the jury, whether other
jurors also should have been stricken becomes a moot point. See Morgan v.
Illinois, 504 U.S. 719, 729 (1992) ("If even one [biased] juror is empaneled and
the death sentence is imposed, the State is disentitled to execute the sentence.").
Although the majority states that I do not "dispute that the OCCA both correctly
identified and reasonably applied Witt's standard when it came to juror J.S.,"
Maj. Op. at 22, the fact of the matter is that I offer no opinion on the OCCA's
resolution of Eizember's challenge to juror J.S.

2

long as it has been proven the person is guilty, especially if they have taken the lives of others." To Question No. 62, which asked "what purpose do you think the death penalty serves in our society?" D.B. responded, "keeps taxpayers from having to support a criminal for the remainder of their life." Question No. 63 asked if the prospective juror thought the death penalty in Oklahoma is used too often. D.B. responded, "definitely not too often." Question No. 64 listed 5 alternatives and the prospective juror was instructed to select the one which best summarized their general views about capital punishment. The choices were as follows:

> 1. I am opposed to capital punishment under any circumstances.
> 2. I am opposed to capital punishment except, in a few cases where it may be appropriate.
> 3. I am neither generally opposed, nor generally in favor of capital punishment.
> 4. I am in favor of capital punishment, except in a few cases where it may not be appropriate.
> 5. I am strongly in favor of capital punishment as an appropriate penalty.

D.B. checked the last alternative. Question No. 65 asked the following:

> Assume you are on a jury to determine the sentence of a defendant who has already been convicted of a very serious crime. If the law gives you a choice of death or life imprisonment, or some other penalty; (check one)
>
> 1. I could not vote for the death penalty regardless of the facts and circumstances of the case.
> 2. There are some kinds of cases in which I know I could not vote for the death penalty even if the law allowed me to, but others in which I would be willing to consider voting for it.
> 3. I would consider all of the penalties provided by law and the facts and circumstances of the particular case.
> 4. I would usually vote for the death penalty in a case where the law allows me to.
> 5. I would always vote for the death penalty in cases where the law allows me to.

3

D.B. checked the third alternative that she "would consider all of the penalties provided by law and the facts and circumstances of the particular case." No other questions on the written questionnaire pertained to capital punishment.

Under questioning by the prosecutor during *voir dire*, Juror D.B. said she could consider all three punishment options—the death penalty, life without parole, and life in prison. She said she would do so based on the evidence brought forth in the courtroom and the instructions given by the court. She said she could put aside any personal beliefs or predispositions and decide the case on the evidence, and she did not have any moral, ethical or religious obligations that would keep her from doing so.

Under questioning by defense counsel, Juror D.B. reiterated that she could consider all three possible punishments. When specifically asked if she could consider a life sentence if the defendant was found guilty of intentional murder, she replied, "I could consider a sentence of life." Defense counsel then asked if her consideration "would be any more meaningful than my consideration of moving furniture?" She replied, "yes." Defense counsel's voir dire of D.B. continued as follows:

> MR. CORGAN (defense counsel): . . . How about the sentence of life without parole, could you consider that as well?
>
> PROSPECTIVE JUROR D.B.: If the death penalty was not an option.
>
> MR. CORGAN: Okay, tell me what you mean by that.
>
> PROSPECTIVE JUROR D.B.: If they're in prison for the remainder of their life without the possibility of parole why not the death penalty?
>
> MR. CORGAN: All right, so are you, are you telling me then that if you had a situation where it was laid out on the table, life, life without parole or death, then you would automatically consider one of the those?

4

PROSPECTIVE JUROR D.B.: Automatically consider one of—

MR. CORGAN: One of those punishments over the others?

PROSPECTIVE JUROR D.B.: Probably.

MR. CORGAN: And—

PROSPECTIVE JUROR D.B: Yes.

MR. CORGAN: And that would be death?

PROSPECTIVE JUROR D.B: Yes.

MR. CORGAN: So—

PROSPECTIVE JUROR D.B: Let me get you, you said that the evidence had already been there and it's over and it's the penalty phase, right?

MR. CORGAN: When we talk about punishment you've already made the determination of intentional murder beyond a reasonable doubt, okay?

PROSPECTIVE JUROR D.B: Uh-huh.

MR. CORGAN: That's where we are.  Within that context are you telling me that you would automatically say it should be the death penalty?

PROSPECTIVE JUROR D.B: I would have to look at all three but just off the cuff, it would probably be death.

MR. CORGAN: And do you feel that you could give meaningful consideration to life?

PROSPECTIVE JUROR D.B: Yes.

MR. CORGAN: Do you feel that you could give meaningful consideration to life without parole?

5

PROSPECTIVE JUROR D.B: I would have to try hard.

MR. CORGAN: Okay and I appreciate that answer. In trying hard if you and my client were to switch places today and you were on trial would you want a juror with that type of mindset?

PROSPECTIVE JUROR D.B: Personally, yes.

MR. CORGAN: Okay.

PROSPECTIVE JUROR D.B: Okay.

MR. CORGAN: Do you feel like—

PROSPECTIVE JUROR D.B: I would not want to spend my life in prison without the possibility of parole.

Later during *voir dire*, defense counsel asked the panel if they understood that if the State does not prove an aggravating circumstance to the jury's satisfaction beyond a reasonable doubt then the jury would not be allowed to consider the option of death. When specifically asked if she understood, Juror D.B. replied, "if it's not an option I wouldn't have a problem with it" and that she could consider the other two punishments of life and life without parole. This was the extent of Juror D.B.'s *voir dire* on her views of capital punishment.

Id. at 223-225 (paragraph numbers omitted).

After [Eizember]'s portion of the life/death qualification, defense counsel raised challenges for cause to several prospective jurors including Jurors D.B. and J.S. [In particular, defense counsel argued that D.B. "said in her questionnaire that she firmly believes that if you take a life you should lose yours," and that this answer "contrasted to the answers that she gave during our Voir Dire examination in the . . . courtroom." Tr. Vol. 2 at 276.] The trial court overruled the challenges. [In doing so, the trial court stated that "the questionnaires are to gain information not to be used as traps for when answers are given by prospective jurors who have not been informed of the law. So I am not going to allow them to be used for that purpose." Tr. Vol. 2 at 279.] When it came time to

6

exercise peremptory challenges, Juror D.B. took a seat in the jury box as a result of defense counsel's exercise of his eighth challenge. With his ninth peremptory challenge, [Eizember] removed prospective juror J.L. who was replaced on the panel by J.S. This left both Juror D.B. and Juror J.S. on the jury. After exercising his final peremptory challenge, defense counsel again asked that Juror J.S. be excused for cause based upon his inability to consider all three possible punishments, and based upon the fact that in rescheduling a surgery, counsel surmised "he's just almost too interested in being a juror." The trial court overruled the challenge for cause. Defense counsel then informed the court that if the defense had been granted additional peremptory challenges, Jurors D.B. and J.S. would be struck from the jury.

Id. at 220 (paragraph number omitted).

*II. The OCCA's ruling on the claim*

Eizember argued on direct appeal that the trial court's refusal to strike jurors D.B. and J.S. from the jury deprived him of his constitutional rights to due process and trial by an impartial jury. In addressing this claim on direct appeal, the OCCA stated:

[Eizember] suggests the responses on the juror questionnaire are sufficient by themselves to excuse a prospective juror for cause based upon his or her views of the death penalty. Our research has yielded no capital cases where responses to pre-trial juror questionnaires, without *voir dire*, have been found sufficient to excuse jurors for cause, based upon their views of capital punishment. Indeed, the Supreme Court has warned against oversimplifying the inquiry as to whether jurors can perform their duty notwithstanding their views on the death penalty. "[D]eterminations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism". Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985).

7

"*Voir dire* examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges". Mu'Min v. Virginia, 500 U.S. 415, 431, 111 S.Ct. 1899, 1908, 114 L.Ed.2d 493 (1991). See also Warner v. State, 2006 OK CR 40, ¶ 15, 144 P.3d 838, 858. An important aspect of *voir dire* is to educate prospective jurors on what will be asked of them under the law. As the trial court in this case noted, the questionnaires are a means to collect information and are not to be used "as traps" for prospective jurors who have not yet been informed of the law. In our review of the written questionnaires, we have found they did not advise the jury of the law they would be required to follow, nor did they discuss or explain the process the jurors would be required to follow in the punishment phase of trial, *i.e.*, determining if the alleged aggravator or aggravators had been proved beyond a reasonable doubt and then weighing the aggravators and mitigators to determine the appropriate punishment. This very important part of the jurors' duties in a capital case was not even broached until the oral *voir dire*, and then not fully explained until written instructions were given at the close of the second stage evidence. It is the *voir dire* process which allows counsel and court alike to determine whether the prospective jurors can in fact follow their instructions and oath and whether there are grounds to challenge a potential juror. We find the pre-trial questionnaire cannot trump the actual *voir dire*. The responses to the written questionnaire regarding views on the death penalty are not to be considered in isolation, but in context of the other responses to the questionnaire and oral responses given during *voir dire* in open court. See Witt, 469 U.S. at 429, 105 S.Ct. at 855 (the trial judge's "predominant function in determining juror bias involves credibility findings whose bias cannot be easily discerned from an appellate record.") See also United States v. Chanthadara, 230 F.3d 1237, 1269 (10th Cir. 2000) ("because the jurors are vested with greater discretion in capital cases, the examination of prospective jurors must be more careful than in non-capital cases").

The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Witt, 469 U.S. at 424, 105 S.Ct. at 852. See also Gray v. Mississippi, 481 U.S. 648,

8

658, 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). Inherent in this determination is that the potential juror has been fully informed of the law and his or her responsibilities under the law and oath of a juror. This standard does not require a juror's bias be proved with unmistakable clarity; neither must the juror express an intention to vote against the death penalty automatically. Witt, 469 U.S. at 424, 105 S.Ct. at 852. "Deference must be paid to the trial judge who sees and hears the jurors". Id., 469 U.S. at 425, 105 S.Ct. at 853. See also Uttecht v. Brown, 551 U.S. 1, 127 S.Ct. 2218, 2224, 167 L.Ed.2d 1014 (2007) ("deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors").

This Court has adhered to the principles set forth in Witt. See Glossip v. State, 2007 OK CR 12, ¶¶ 31–33, 157 P.3d 143, 150–151; Williams v. State, 2001 OK CR 9, ¶ 10, 22 P.3d 702, 709 (and cases cited therein). We have said the Witt standard only requires that each juror be willing to consider each of the three statutory punishments: the death penalty, life imprisonment without the possibility of parole, and life imprisonment (with the possibility of parole). Glossip, 2007 OK CR 12 at ¶ 31, 157 P.3d at 150. See also Williams, 2001 OK CR 9 at ¶ 10, 22 P.3d at 709–710. Further, all doubts regarding juror impartiality must be resolved in favor of the accused. Williams, 2001 OK CR 9 at ¶ 10, 22 P.3d at 709–710. This Court will look to the entirety of the juror's *voir dire* examination to determine if the trial court properly excused the juror for cause. Id. As the trial court personally observes the jurors and their responses, this Court will not disturb its decision absent an abuse of discretion. Id.

Id. at 220-222 (alteration in original; internal paragraph numbers and footnotes omitted).

Reviewing D.B.'s responses in total, her responses do not demonstrate an impossible bias towards the death penalty. Individual responses read in isolation may suggest such a bias as [Eizember] claims. However, other responses indicate Juror D.B. could be a fair and impartial juror. This situation points out the importance of the oral *voir dire*. Although the juror questionnaire mentioned there were three possible punishments for a conviction for intentional

9

murder, no options other than the death penalty were addressed. The questionnaire did not explain the law regarding proof of aggravators or weighing of the mitigating evidence against the aggravators. Despite these omissions, D.B. indicated she could consider all punishment options. It was not until *voir dire*, and specifically questioning by defense counsel, that the juror's views on the other punishment options were explored. D.B. did not say she would automatically consider the death sentence. Her response that "off the cuff" she would consider death as punishment for intentional murder does not indicate a predisposition toward the death penalty, but rather illustrates a "gut reaction." We are confident that any determination made during jury deliberations would be an informed decision and not merely "off the cuff."

As further evidence of her partiality, [Eizember] cites to Juror D.B.'s failure to state that she could "fairly" consider all three punishment options. See Hanson v. State, 2003 OK CR 12, ¶ 10, 72 P.3d 40, 48 ("that single word [fairly] carries an inescapable constitutional weight".) Here, the court asked the entire panel whether they could give "fair consideration" to each punishment option. That neither the prosecutor nor defense counsel used the term "fairly consider" in their examination of the juror is not grounds for a finding of partiality. Juror D.B.'s responses suggest she might have trouble considering all three options equally. However, that is not the standard required by law. To withstand a challenge for cause concerning punishment issues, a venireperson need only be willing to consider all the penalties provided by law and not be irrevocably committed to any one punishment option before the trial has begun. Gilbert v. State, 1997 OK CR 71, ¶ 26, 951 P.2d 98, 108. Here, Juror D.B. indicated she could consider all possible punishment options. Any ambiguities in D.B.'s responses or questions as to her ability to be a fair and impartial juror were for the trial court to resolve. Having the benefit of observing D.B.'s demeanor throughout *voir dire*, the court found her responses credible and insufficient to excuse her for cause. Our review of the totality of her *voir dire*, written and oral responses, supports the trial court's finding that Juror D.B. did not have such a strong bias towards the death penalty that the performance of her duties as juror would be prevented or substantially impaired. Accordingly, the trial court did not abuse its discretion in refusing to remove her for cause.

10

Id. at 225-26 (last alteration in original; internal paragraph numbers and footnote omitted).

## III. *Analysis*

### *Standard of review*

Because the claim at issue was adjudicated on the merits by the OCCA, our standard of review is governed by 28 U.S.C. § 2254(d)(1), which provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

28 U.S.C. § 2254(d)(1).

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court discussed, at length, the meaning of the two clauses of § 2254(d)(1). "A state court decision," the Supreme Court explained, is "contrary to . . . clearly established [Supreme Court] precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," id. at 405, or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent," id. at 406. The Court further explained that "a state-court decision can involve an 'unreasonable application' of th[e] Court's clearly

11

established precedent in two ways." Id. at 407. "First, a state court decision involves an unreasonable application of th[e] Court's precedent if the state court identifies the correct governing legal rule from th[e] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. "Second, a state-court decision also involves an unreasonable application of th[e] Court's precedent if the state court either unreasonably extends a legal principle from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id.

*Clearly established federal law*

Eizember points to several Supreme Court cases as supplying the clearly established federal law applicable to this claim. To begin with, he points to Uttecht v. Brown, 551 U.S. 1 (2007) and Morgan v. Illinois, 504 U.S. 719 (1992), for the principle

that "[t]he Constitution," in particular "the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment," "requires an unbiased jury." Aplt. Br. at 26. He in turn cites Wainwright v. Witt, 469 U.S. 412 (1985), for the principle that "[a] juror's bias need not be proved with 'unmistakable clarity' before he should be excused for cause." Id. at 27.

Addressing these cases in chronological order, the Supreme Court in Witt "examine[d] . . . the procedures for selection of jurors in criminal trials involving

12

the possible imposition of capital punishment." 469 U.S. at 414. In doing so, the Court outlined several principles that are applicable to Eizember's appeal. To begin with, the Court emphasized that, "[a]s with any other trial situation where an adversary wishes to exclude a juror because of bias, . . . it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality." Id. at 423. In turn, the Court noted, "[i]t is then the trial judge's duty to determine whether the challenge is proper." Id. The Court explained that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Id. at 424 (internal quotation marks omitted). "[T]his standard," the Court held, "does not require that a juror's bias be proved with 'unmistakable clarity.'" Id. But, the Court noted, "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." Id. at 425-26. "[T]his is why," the Court explained, "deference must be paid to the trial judge who sees and hears the juror." Id. at 426.

The Court in Witt also emphasized that "a trial judge's finding that a particular venireman was not biased and therefore was properly seated [i]s a finding of fact subject to § 2254(d)." Id. at 428. "[S]uch a finding," the Court

13

noted, "is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." Id. The same holds true, the Court held, for "a trial court's determination that a prospective capital sentencing juror was properly excluded for cause." Id. at 429. Finally, the Court held that in making these determinations, a "trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record." Id.

In Morgan, the Supreme Court considered "whether, during *voir dire* for a capital offense, a state trial court may, consistent with the Due Process Clause of the Fourteenth Amendment, refuse inquiry into whether a potential juror would automatically impose the death penalty upon conviction of the defendant." 504 U.S. at 721. In addressing this question, the Court held that "[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." Id. at 729. The Court explained that "because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror." Id. "Therefore," the Court held, "based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such

14

views." Id. And, the Court held, "[i]f even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." Id.

The Court in turn held that these principles afford a defendant the "right to make inquiry" during voir dire, id. at 734, in order to ferret out "those biased persons on the venire who as jurors would unwaveringly impose death after a finding of guilt," id. at 733. Such inquiry, the Court emphasized, is not limited to "general fairness and 'follow the law' questions." Id. at 734. Instead, the Court held, a defendant is "entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case in chief, ha[ve] predetermined the terminating issue of [the] trial, that being whether to impose the death penalty." Id. at 736.

Finally, in Uttecht, the Supreme Court reviewed its past precedents and noted that they established "at least four principles" relevant to voir dire during a capital trial:

> First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.

551 U.S. at 9 (internal citations omitted).

15

*Eizember's challenge to the OCCA's decision*

Eizember argues that the OCCA's decision "was contrary to and an unreasonable application of well-established Supreme Court precedent." Aplt. Br. at 31. In particular, Eizember asserts that the OCCA, in assessing the totality of D.B.'s responses, " wrongly conclude[d] that any consideration [of the three sentencing options] w[ould] do so long as D.B. w[a]s not 'irrevocably committed to any one punishment.'" Id. at 28 (quoting Eizember, 164 P.3d at 226). "That," Eizember argues, "is not the correct standard." Id. After carefully examining the OCCA's decision and relevant Supreme Court precedent, I and my concurring colleague agree that the OCCA applied an incorrect legal standard when addressing Eizember's assertion that juror D.B. was biased. See Conc. Op. at 1 (McHugh, J., concurring).

The critical flaw in the OCCA's analysis is that, in evaluating D.B.'s responses, it applied a legal standard that is inconsistent with clearly established federal law. To be sure, the OCCA began its analysis by correctly identifying and quoting from Witt. 164 P.3d at 221. And it concluded its analysis with language that can fairly be said to track Witt. Id. at 226. The problem, however, is what lies in between.

After initially identifying and quoting from Witt, the OCCA stated that it had long "adhered to the principles set forth in Witt." Id. at 222. The OCCA explained: "We have said the Witt standard only requires that each juror be

16

willing to consider each of the three statutory punishments: the death penalty, life imprisonment without the possibility of parole, and life imprisonment (with the possibility of parole)."  Id.  Subsequently, in "[r]eviewing D.B.'s responses in total" and concluding that they "d[id] not demonstrate an impossible bias towards the death penalty," id. at 225, the OCCA relied on its own precedent and the standard developed thereunder, which it believed was consistent with Witt:

> Juror D.B.'s responses suggest she might have trouble considering all three options equally.  However, that is not the standard required by law.  To withstand a challenge for cause concerning punishment issues, a venireperson need only be willing to consider all the penalties provided by law and not be irrevocably committed to any one punishment option before the trial has begun.

Id. at 225-26 (citing Gilbert v. State, 951 P.2d 98, 108 (Okla. Crim. App. 1997)).

From what I can determine, this "irrevocably committed" standard was developed by the OCCA shortly after, and was based upon the OCCA's interpretation of, the Supreme Court's decision in Witherspoon v. Illinois, 391 U.S. 510 (1968).  See, e.g., Davis v. State, 665 P.2d 1186, 1191 (Okla. Crim. App. 1983); Gibson v. State, 501 P.2d 891, 896 (Okla. Crim. App. 1972); Koonce v. State, 456 P.2d 549, 554 (Okla. Crim. App. 1969).  More specifically, the standard was based upon the following language found in footnote 21 of Witherspoon:

> Just as veniremen cannot be excluded for cause on the ground that they hold such views [i.e., "general objections to the death penalty or . . . conscientious or religious scruples against its infliction"], so too they cannot be excluded for cause simply because they indicate that

17

there are some kinds of cases in which they would refuse to recommend capital punishment. And a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him. The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings.

301 U.S. at 522 n.21.[10]

Importantly, the Supreme Court has since held that the language of footnote 21 in Witherspoon does not set forth the controlling standard for assessing potential jurors in a capital case. In Witt, the Supreme Court recognized that its post-Witherspoon decisions had deviated from the language of footnote 21 and "demonstrate[d] no ritualistic adherence to a requirement that a prospective juror make it 'unmistakably clear . . . that [she] would *automatically* vote [for or] against the imposition of capital punishment . . . .'" 469 U.S. at 419 (first alteration in original; italics in original). In particular, the Supreme Court noted that the standard it had announced and applied in Adams v. Texas, 448 U.S. 38 (1980), "differ[ed] markedly from the language of footnote 21" in Witherspoon. 469 U.S. at 421. Because of the confusion caused by these conflicting decisions, the Supreme Court took "th[e] opportunity to clarify [its] decision in

---

[10] The OCCA was not alone in doing so. As the Supreme Court discussed in Witt, "[d]espite Witherspoon's limited holding, later opinions in this Court and the lower courts have referred to the language in footnote 21 . . . as setting the standard for judging the proper exclusion of a juror opposed to capital punishment." 469 U.S. at 418.

18

Witherspoon, and to reaffirm the . . . standard from Adams as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment." Id. at 424. "That standard [i.e., the Adams standard]," the Court stated, "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Id. (quoting Adams, 448 U.S. at 45). The Court "note[d] that, in addition to dispensing with Witherspoon's reference to 'automatic' decisionmaking, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.'" Id. "This is because," the Court stated, "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." Id.

The problem is that, since Witt, the OCCA has failed to revise or abandon its "irrevocably committed" standard. Instead, the OCCA has concluded that its "irrevocably committed" standard is "[e]ssentially . . . the same" as the Witt standard, Carter v. State, 879 P.2d 1234, 1244 (Okla. Crim. App. 1994), and it has continued to routinely apply the standard in capital cases, including Eizember's. Indeed, in analyzing Juror D.B.'s written and oral responses and concluding that the state "trial court did not abuse its discretion in refusing to remove her for cause," the OCCA emphasized that she "indicated she could consider all possible punishment options." Eizember, 164 P.3d at 226.

19

Quite clearly, however, the OCCA's "irrevocably committed" standard is not the same as, and indeed is less demanding than, the controlling standard outlined in <u>Witt</u> (i.e., the <u>Adams</u> standard). The result is that a potential juror could satisfy the "irrevocably committed" standard and be permitted to sit as a juror, yet fail to meet the <u>Witt/Adams</u> standard.

And that appears to be precisely the situation in Eizember's case with respect to juror D.B. To begin with, D.B.'s responses to questioning by defense counsel during voir dire clearly suggested that she would have difficulty giving adequate consideration to the option of life without parole. When asked by defense counsel if she would "automatically" choose one of the three possible sentencing options for capital murder, she stated that she "[p]robably" would choose a sentence of death. Defense counsel followed up on D.B.'s response by asking her directly if she would automatically choose the death penalty. D.B. responded, "I would have to look at all three but just off the cuff, it would probably be death." Relatedly, D.B. stated that she "would have to try hard" to give meaningful consideration to the sentence of life without parole. She explained that death would be her own choice if she were a defendant choosing between those two options. Notably, these answers, which clearly displayed a strong, if not automatic, preference for the death penalty, were largely consistent with her answers on the written questionnaire. For example, on the written questionnaire, D.B. was asked "What purpose do you think the death penalty

20

serves in our society." D.B.'s Jury Information Questionnaire at 9. D.B. stated in response: "Keeps taxpayers from having to support a criminal for the remainder of their life." Id. When asked on the questionnaire to "[c]heck the 'one' statement which 'best' summarizes your general views about capital punishment (the death Penalty)," D.B. checked option #5, which stated, "I am strongly in favor of capital punishment as an appropriate penalty." Id. Lastly, in response to the question "What are your feelings about the death penalty?," D.B. stated, "I have no reservations about seeing someone put to death so long as it has been proven the person is guilty, especially if they have taken the lives of others." Id.

It appears to be a close question whether these responses were sufficient to satisfy the OCCA's own "irrevocably committed" standard. Although D.B. came quite close to indicating that she would automatically vote to impose the death penalty, her responses could perhaps reasonably be construed as indicating a willingness to at least consider all three available penalties. Under the Witt/Adams standard, however, it is clear that D.B.'s views would have prevented or substantially impaired the performance of her duties as a juror in accordance with her instructions and oath.[11] More specifically, D.B.'s responses "made it

---

[11] "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Morgan, 504 U.S. at 727. Such "jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." Lockhart v. McCree, 476 U.S. 162, 184 (1986). In the context of a capital murder case, each juror's "verdict must be based upon the evidence developed at trial." Morgan, 504 U.S. at 727. "'[A] juror who has
(continued...)

21

unmistakably clear that [she] could not be trusted to abide by existing law and to follow conscientiously the instructions of the trial judge." Witt, 469 U.S. at 419 (internal quotation marks omitted). Consequently, she should have been stricken for cause under that standard.

For these reasons, the OCCA's analysis of Eizember's challenge to the state trial court's refusal to excuse juror D.B. was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). "[A]lthough" this "does not [automatically] entitle [Eizember] to the issuance of a writ of habeas corpus, it effectively removes AEDPA's prohibition on the issuance of a writ." Milton v. Miller, 744 F.3d 660, 670-71 (10th Cir. 2014) (internal citation omitted). That in turn "requires us to review de novo his" claim regarding the trial court's failure to excuse juror D.B. for cause, "rather than deferring to the OCCA's resolution of that claim." Id. at 671.

*The state trial court's determination*

In determining whether "a prospective capital sentencing juror" should be "excluded for cause," a trial court "appl[ies] some kind of legal standard to what [it] sees and hears" from the juror and it ultimately makes a finding of fact regarding that juror's state of mind. Witt, 469 U.S. at 429. Generally speaking,

---

[11](...continued) formed an opinion [prior to trial] cannot be impartial.'" Id. (quoting Reynolds v. United States, 98 U.S. 145, 155 (1879)).

22

such a finding is "owed deference by reviewing courts" because the trial court was in a unique "position to assess the demeanor of the" juror. Uttecht, 551 U.S. at 9.

As I shall proceed to describe, the state trial court in this case made such a finding regarding juror D.B. But in doing so, the state trial court, presumably and understandably attempting to follow OCCA precedent, applied an improper legal standard. As a result, its finding regarding juror D.B.'s impartiality is essentially meaningless and entitled to no deference because it failed to apply the correct Witt/Adams standard.

At the beginning of Eizember's trial, the state trial court split the pool of potential jurors into three groups. Juror D.B. was in the second group. At the outset of the questioning of the second group, the state trial court gave the potential jurors a brief description of the case and informed them that the purpose of the questioning was to "see[] if there are any of you who have preconceived notions or ideas or beliefs that you cannot set aside that are not fit to hear this case." Tr., Vol. 1 at 164. The state trial court then conducted its own questioning of the second group. In doing so, it asked the potential jurors:

> If you find the defendant guilty of Murder in the First Degree can you consider all three of these legal punishments, death, imprisonment for life without parole or imprisonment for life and impose the one warranted by law and evidence? Okay, now that was a long question, wasn't it, but what we are finding out here is that and remember we are assuming just for the purpose of this question that you do find the defendant guilty of Murder in the First Degree,

23

can you just give a fair consideration to all three possible punishments and base your decision solely upon the facts in the case, not upon any preconceived bias for or against any one of the three punishments?

Id. at 174-75.

As potential jurors responded, the state trial court repeatedly summarized the legal standard it was applying:

The question is can you consider all three of the punishments, possible ranges of punishment?

Id. at 178.

[C]an you give consideration to all three ranges of punishment and impose the one that the facts and the law requires . . . ?

Id.

Is there anyone on the third row that if the jury found beyond a reasonable doubt the defendant is guilty of the Murder in the First Degree could not consider all three of the legal punishments which are death, imprisonment for life without parole or imprisonment for life, is there any person on the third row that cannot consider any one, any one of those three or that would automatically impose one of those three?

Id. at 180.

What I want to know is just the basic rule, will you consider all three of them or are [you] telling me that your mindset is against life so strongly that it cannot be considered or that you have a prejudice against --

Tr. Vol. 2 at 255.[12]

---

[12] At no point did the state trial court make any comments that reflected the controlling Witt/Adams standard, i.e., whether a venireperson's views would

(continued...)

24

These statements from the state trial court make clear that it was applying the OCCA's own "irrevocably committed" standard, rather than the Witt/Adams standard, in assessing the responses from each of the potential jurors.[13] As a result, its finding that juror D.B. was qualified under the "irrevocably committed" standard to serve on Eizember's jury, even if afforded deference by this court, tells us nothing about whether juror D.B. was qualified to serve under the proper Witt/Adams standard.

*The majority opinion*

The majority makes several assertions that are erroneous and thus require a response. To begin with, the majority is wrong in asserting that Eizember forfeited any challenge to the OCCA's use of its own "irrevocably committed" standard. According to the majority, "[i]n six and a half years of proceedings in

---

[12](...continued)
prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.

[13] The majority seems to suggest that the questions posed by the state trial court do not reflect the legal standard that it actually applied in assessing the answers given by the potential jurors. Maj. Op. at 24 n.5. If that is true, then what was the point of the state trial court asking these questions? Further, there is nothing in the trial transcript or elsewhere in the record that suggests the state trial court applied a standard different than the one reflected by its questions. Indeed, rarely, if ever, will a trial court issue a written order outlining the legal standard it is applying in assessing the responses of potential jurors. As a result, we are left to examine the oral statements that the trial court makes in the course of examining jurors and ruling on challenges for cause. Doing so in this case reveals that the trial court was, not surprisingly, relying on Oklahoma's flawed interpretation of Witt (an interpretation that erroneously equated the Witt standard and the OCCA's own "irrevocably committed" standard).

25

federal court . . . Eizember never argued . . . that the OCCA employed a legal standard 'contrary to' <u>Witt</u>." Maj. Op. at 18. "Instead," the majority asserts, "accepting that the OCCA correctly identified <u>Witt</u> as the governing standard, . . . Eizember has argued only that the OCCA's application of that standard — the answer it gave to the question <u>Witt</u> poses — was unreasonable given the facts in this particular case." <u>Id.</u> Indeed, the majority asserts, "there's nothing in . . . Eizember's district court petition" or "in his opening brief in this court" that "resembl[es] the" legal flaws I have outlined above. <u>Id.</u> As I shall outline below, however, the majority ignores key passages in Eizember's federal court pleadings and ultimately paints a distorted picture of Eizember's legal challenge to the trial court's refusal to strike juror D.B. The majority also wrongly assumes that, in considering the totality of juror D.B.'s responses, the OCCA actually answered the question that <u>Witt</u> poses.

Ground I of Eizember's federal habeas petition alleged that "the trial court's erroneous denial of challenges for cause left biased jurors on [his] jury, depriving him of trial by an impartial jury and due process in violation of the Sixth and Fourteenth Amendments." Dist. Ct. Docket No. 24 at 23 (capitalization omitted). In support of this issue, Eizember outlined the facts relevant to the claim, as well as the OCCA's resolution of the claim. <u>Id</u>. at 23-29. In a section entitled "Argument and Authority," Eizember then cited Supreme Court and Tenth Circuit law regarding the right to an impartial jury, and proceeded to

26

discuss the application of that law to jurors D.B. and J.S.  Id. at 30-38.  In the

subsection discussing juror D.B., Eizember, quoting from the dissenting opinion

of OCCA Judge Chapel, characterized as "'absurd,'" id. at 32 (quoting Eizember,

164 P.3d at 249 (Chapel, J., dissenting)), the OCCA majority's "suggest[ion] that

any consideration [of the three available sentencing options] will do as long as the

juror is not 'irrevocably committed to any one punishment,'" id. (quoting

Eizember, 164 P.3d at 226).  Notably, as I have already indicated, Eizember

repeated this argument in his opening appellate brief:

> Discounting the fact that D.B.'s "responses suggest she might
> have trouble considering all three options equally," the OCCA
> majority wrongly concludes that any consideration will do as long as
> D.B. is not "irrevocably committed to any one punishment."
> Eizember, 164 P.3d at 226.  That is not the correct standard.

Aplt. Br. at 28.  These arguments, though brief, correctly identified the key flaw

in the OCCA's analysis of juror D.B. and its purported application of the Witt

standard.

The majority, in its effort to avoid the issue, characterizes these as nothing

more than "stray sentences" that "are insufficient to present an argument . . . in a

way that might fairly inform opposing counsel or a court of its presence in the

case."  Maj. Op. at 20.  That characterization, however, is simply inaccurate.  At

worst, Eizember's counsel could, and perhaps should, have argued the issue in

greater detail.  But nothing about the above-quoted statements was random,

incidental, unintentional, or otherwise lacking in purpose.  See Webster's Third

27

New Int'l Dictionary at 2258 (1993) (defining the adjective "stray"). Quite clearly, Eizember's counsel understood and attempted to convey that the OCCA had applied an improper legal standard in assessing the totality of D.B.'s responses. Moreover, Eizember's counsel in no way conceded or accepted that the OCCA correctly identified and employed the Witt standard. Maj. Op. at 17-18.

The majority also inaccurately frames my position in this case by suggesting that I think "we don't need to reach the question whether the OCCA reasonably applied Witt because that court didn't apply Witt at all." Maj. Op. at 17. The fact of the matter is that I agree we must examine the OCCA's purported application of Witt because that is precisely where the OCCA's error occurred. As I have previously noted, the OCCA began addressing Eizember's challenge to juror D.B. and J.S. by properly identifying Witt as providing the controlling legal standard. In the course of purportedly applying that standard to juror D.B., however, the OCCA actually relied on its own "irrevocably committed" standard; a standard the OCCA erroneously thought was the equivalent of the Witt standard. Thus, there was no error on the part of the OCCA in the initial "identification" stage. Rather, the OCCA erroneously deviated from the Witt standard in the course of attempting to "apply" it to juror D.B. In light of all this, it is perfectly understandable why Eizember has focused his arguments on the OCCA's purported "application" of Witt.

28

Further, the majority is wrong in suggesting that we can we neatly divide our analysis in this case between § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses, or that the error I have outlined necessarily falls within the "contrary to" clause. Indeed, a reasonable argument can be made that the OCCA's error in this case implicates both clauses of § 2254(d)(1). In terms of the "contrary to" clause, the OCCA actually applied (but did not realize it was doing so) "a rule that contradicts the governing law set forth in" <u>Witt</u>. <u>Williams</u>, 529 U.S. at 405. In terms of the "unreasonable application" clause, the OCCA "identifie[d] the correct governing legal rule . . . but unreasonably applie[d] it to the facts of [Eizember's] case" by unwittingly substituting a standard (the "irrevocably committed" standard) that it thought was the equivalent of <u>Witt</u>. <u>Williams</u>, 529 U.S. at 407.

In any event, it matters not which clause of § 2254(d)(1) we rely upon because, contrary to the majority's assertion, both the parties and the district court consistently treated Eizember's claim as invoking both clauses of § 2254(d)(1). Further, the respondent in this case has never asserted any type of forfeiture argument, either in the district court or before us.

In the end, I submit that Eizember, who is challenging the constitutionality of a death sentence "unique in its severity and irrevocability," <u>Barclay v. Florida</u>, 463 U.S. 939, 958 (1983) (Stevens, J., concurring), has sufficiently argued the claim to have placed it at issue both in the district court (which essentially

29

overlooked the key component of the claim) and in this court. At an absolute minimum, I submit that Eizember's attempt to raise this issue in the district court and on appeal, combined with the gravity of his sentence, warrants the exercise of our discretion in proceeding to address whether the OCCA and the state trial court, in assessing D.B.'s responses, applied a legal standard that was inconsistent with Witt. See Abernathy v. Wandes, 713 F.3d 538, 552 (10th Cir. 2013) (stating that "the decision regarding what issues are appropriate to entertain on appeal in instances of lack of preservation is discretionary.").

*IV. Conclusion*

I ultimately conclude, after considering juror D.B.'s written and oral responses as a whole, that she should have been stricken for cause under the Witt/Adams standard and that the state trial court erred in failing to do so. And, because the constitutional requirement of an impartial jury is violated if even a single juror is unable to carry out his or her sworn duties, see Ross v. Oklahoma, 487 U.S. 81, 85 (1988), this error was not harmless. As a result, I conclude that Eizember is entitled to federal habeas relief on this claim, in the form of a new sentencing proceeding.

**No. 14-6012, Eizember v. Trammell**

**McHUGH**, Circuit Judge, concurring:

I join the majority's well-reasoned analysis in most respects, and concur in its holding that Mr. Eizember is not entitled to habeas relief. I write separately to note my disagreement with the majority's conclusion that the OCCA applied the correct legal standard in evaluating Mr. Eizember's claim that Juror D.B. was biased.

In my view, the dissent is correct that the OCCA's opinion reflects its continuing erroneous belief that a juror may withstand a challenge for cause unless she is "irrevocably committed" to any one punishment option. *See Eizember v. State*, 164 P.3d 208, 225-26 (Okla. Crim. App. 2007) ("To withstand a challenge for cause concerning punishment issues, a venireperson need only be willing to consider all the penalties provided by law *and not be irrevocably committed to any one punishment option before the trial has begun*." (emphasis added)). This is no longer a correct statement of the law under *Wainwright v. Witt*, 469 U.S. 412, 421-26 (1985). And contrary to OCCA authority suggesting otherwise, the "irrevocably committed" standard is not "[e]ssentially . . . the same" as the "substantially impaired" standard articulated in *Witt*. *See Carter v. State*, 879 P.2d 1234, 1243-44 (Okla. Crim. App. 1994).

Despite the OCCA's apparent confusion about the continuing utility of the "irrevocably committed" standard, I join in the majority's conclusion that

Mr. Eizember is not entitled to habeas relief for two reasons. First, as the majority opinion explains, Mr. Eizember forfeited any argument that the OCCA applied the incorrect legal standard. He did not fairly raise this issue in the trial court, on direct appeal, during his postconviction proceedings, or in the briefing to this court. Unlike the dissent, I do not read Mr. Eizember's federal habeas petition as fairly asserting a challenge to the OCCA's use of the "irrevocably committed" standard. *See* Dist. Ct. Dkt. 24 at 30-38. Although Mr. Eizember set forth the general legal standard by explaining that 28 U.S.C. § 2254(d)(1), permits federal habeas relief if a state court's decision is "contrary to" law or "an unreasonable application" of that law, he based his claim for relief solely on the "unreasonable application" prong. It is apparent the district court did not understand Mr. Eizember to be challenging the legal standard applied by the OCCA, because it never addressed the "contrary to law" prong of § 2254(d)(1) in its decision. Indeed, the district court applied AEDPA deference to the OCCA's conclusions, upon the assumption—unchallenged by Mr. Eizember—that the OCCA applied the correct legal standard. *See* Dist. Ct. Dkt. 44 at 19-21. Finally, the dissent identifies two sentences from Mr. Eizember's appellate brief that can be read to assert the OCCA did not apply the correct standard. Aplt. Br. at 28. But Mr. Eizember wholly fails to support that passing assertion with any argument or citation to supporting authority. This single unsupported statement in an eighty-page brief is insufficient to place the question fairly before us or the

2

respondent.[14]  In short, although the dissent has done a masterful job of constructing this argument on behalf of Mr. Eizember at this advanced stage of his legal saga, it is forfeited.

Second, even if we were to exercise our discretion to consider the issue despite Mr. Eizember's forfeiture, as urged by the dissent, I would reach the same conclusion with respect to Mr. Eizember's petition for relief. Where the OCCA has applied an incorrect legal standard, we are required to review its decision de novo, without affording deference to the OCCA's decision. Here, we must determine whether Juror D.B. was "substantially impaired," but we do so constrained by the significant deference afforded trial court decisions regarding juror bias. *See Witt*, 469 U.S. at 426 (explaining that "deference must be paid to the trial judge who sees and hears the juror").  As the majority opinion highlights, the Supreme Court has instructed that "where the record does not indicate the standard applied by a state trial judge, he is presumed to have applied the correct one," *id.* at 431, and if the record is ambiguous, we defer to the credibility determination made by the trial judge after extensive voir dire.  Maj. Op. at 24 & n.5.  The dissent infers from the trial court record that the trial judge applied the wrong standard in striking jurors for cause; I read that record as being silent on

_____

[14]The dissent notes the respondent has never raised a forfeiture argument before this court.  Dissent at 27. This is true. In fact, the respondent, like the district court, never addressed the issue of whether the OCCA applied the correct standard at all.  In my view, this merely reflects that fact that Mr. Eizember never fairly raised this issue.

3

the standard applied by the trial court. Accordingly, I am bound by controlling authority to defer to the trial court's assessment of Juror D.B.'s fitness to serve and, therefore, to deny Mr. Eizember the relief he requests.